UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-14021-CR-ROSENBERG/MAYNARD

UNITED STATES OF AMERICA,

      Plaintiff,

v.

TERRANCE MACTAVIAS SHOLTZ,

      Defendant.

_____/

## REPORT AND RECOMMENDATION ON ALLEGED VIOLATIONS OF SUPERVISED RELEASE

On April 4, 2025, U.S. District Judge Robin L. Rosenberg issued a warrant for the arrest of Defendant, Terrance Mactavias Sholtz ("Defendant"), based on a Petition for Warrant or Summons for Offender Under Supervision ("Petition"). DE 28. The Petition charges Defendant with the following violations of supervised release:

| | |
|---|---|
| **Violation Number 1** | **Violation of Mandatory Condition**, by failing to refrain from violation of the law. On or about June 25, 2024, in Highlands County, Florida, the defendant committed the offense of Battery on a Firefighter or Emergency Medical Care Provider (two counts), contrary to Florida Statute 784.07. |
| **Violation Number 2** | **Violation of Mandatory Condition**, by failing to refrain from violation of the law. On or about June 25, 2024, in Highlands County, Florida, the defendant committed the offense of Resisting officer without violence, contrary to Florida Statute 843.02. |
| **Violation Number 3** | **Violation of Mandatory Condition**, by failing to refrain from violation of the law. On or about June 25, 2024, in Highlands County, Florida, the defendant committed the offense of Possession of a firearm by a convicted felon, contrary to Florida Statutes 775.087 and 790.23. |

1

DE 28 at 2. I held a final hearing on the alleged violations on July 9, 2025. Based on the testimony and evidence presented and the governing law, I find that the Government has not satisfied its burden to show by a preponderance of the evidence that Defendant committed Violations 1, 2, or 3 as alleged in the Petition. I therefore recommend that Violations 1, 2, and 3 be dismissed.

## BACKGROUND

This matter arises from an incident that occurred on June 25, 2024, when Highlands County EMS responded to a call for medical attention for a potential stroke patient. The patient was Defendant's mother-in-law, who was nonresponsive. Prior to EMS personnel's arrival, family members had attempted to contact 911. For reasons unknown, the family's calls were repeatedly routed to Hardee County, whose staff could not help, because the emergency was in Highlands County. Because of the mix-up, the arrival of EMS personnel was delayed, and family members were frantic by the time EMS personnel arrived.

The parties have differing views on what happened next. The evidence establishes as base facts that (1) EMS personnel stepped into a scene in which family members were panicked and frustrated; (2) some family members—including Defendant—were verbally disrespectful and cursed at the EMS personnel; (3) the EMS personnel transported Defendant's mother-in-law to the hospital; and (4) Defendant also went to the hospital, where he was ultimately arrested. The Government alleges that Defendant pushed a stretcher into Paramedic Jenna Levine, causing her to hit a nearby wall (Violation Number 1); displayed a firearm at the scene of the emergency (Violation Number 3); and resisted when Deputy Long later detained Defendant (Violation Number 2). Defendant denies these claims.

To prove the violations, the Government relies on testimony from Highlands County Paramedic Jenna Levine,[1] Highlands County EMT Vincent Anthony Cosenza, and Highlands County Sheriff's Deputy Russell Long. The Government entered two exhibits: (1) the police body-camera footage from Defendant's arrest on June 25, 2024 (Gov't Ex. 1), and (2) the transcript from the May 12, 2025, Probable Cause and Detention Hearing before me (Gov't Ex. 2). Defendant presented testimony from Highlands County Sheriff's Deputy Hannah Ibanez; Defendant's stepdaughters, Shantazia James and Tyasia Faniel; and Defendant's wife, Sherell Wisdom. Defendant entered one exhibit: an employee warning report form regarding Paramedic Levine (Def. Ex. A). Following the hearing, I ordered counsel to submit supplemental briefing by July 16, 2025. Counsel complied. DE 60, DE 61.

## DISCUSSION

In supervised release violation hearings, a court must only find that a defendant violated a condition of his supervised release by a preponderance of the evidence, rather than beyond a reasonable doubt. 18 U.S.C. § 3583(e)(3); *see also Johnson v. U.S.*, 529 U.S. 694, 700 (2000). I consider each violation below.

### 1. Violation 1

The Government contends that Defendant committed battery on an emergency medical provider by pushing a stretcher into Paramedic Levine at Defendant's mother-in-law's home. Defendant contends that he did not intentionally strike Paramedic Levine but was attempting—along with other family members—to lift his mother-in-law onto the stretcher because EMS personnel were not moving fast enough.

---

[1] Paramedic Levine testified at the Probable Cause and Detention Hearing in this matter, and the parties agreed to rely on this testimony for purposes of the final hearing. The transcript of the hearing was entered into evidence at the final hearing as Government's Exhibit 2. DE 56. The full transcript was docketed on May 28, 2025. DE 44.

Violation Number 1 alleges that Defendant violated his supervised release by committing two counts of Battery on a Firefighter or Emergency Medical Care Provider, in violation of Florida Statutes § 784.07. This statute reclassifies, among other crimes, the crime of battery from a first-degree misdemeanor to a third-degree felony when the battery is knowingly committed upon an emergency medical care provider when that provider "is engaged in the lawful performance of his or her duties." Fla. Stat. § 784.07(2). The statute defines "emergency medical care provider" to include a paramedic. Fla. Stat. § 784.07(1)(a). Under Florida law, "the offense of battery occurs when a person . . . [a]ctually and intentionally touches or strikes another person against the will of the other" or "[i]ntentionally causes bodily harm to another person." Fla. Stat. § 784.03(1)(a). Battery against a person included in Section 784.07 "is a specific intent crime and requires a subjective intent to accomplish a statutorily prohibited result." *Adams v. Custer*, No. 14-cv-80403, 2016 WL 155081, at *15 (S.D. Fla. Jan. 12, 2016) (citation omitted). "That is, a conviction for battery . . . requires proof of the specific intent of knowingly battering" a person in the specified role. *Id.*

As an initial matter, I agree with Defendant that it is unclear why the Government asserts Defendant has committed *two* counts of this offense. The Government only asserts that Defendant "committed the offense of battery when he pushed the stretcher into [Paramedic] Levine, thereby striking her." DE 60 at 8. The Government has not established any justifiable basis for a second count of battery.

The Government also has not proven by a preponderance of the evidence that Defendant committed a single count of battery by *intentionally* pushing the stretcher into Paramedic Levine. Paramedic Levine testified that after Defendant cleared the stretcher of equipment and yelled and cursed at Paramedic Levine to "[h]urry up," Defendant "pushe[d] the stretcher" using both of his

hands, causing it to "shove" Paramedic Levine backwards into a wall. DE 44 at 10:4–7, 16:19–21. Paramedic Levine testified that Defendant would have had to move the stretcher "forcefully" for it to have moved as it did. *Id.* at 16:15–22. Paramedic Levine stated that after Defendant touched the stretcher, his mother-in-law was "immediately" placed on the stretcher. *Id.* at 18:13–15. EMT Cosenza described the act as Defendant "push[ing] the stretcher in between [Paramedic Levine] . . . [and EMT Cosenza] to get her out of the way," then placing his mother-in-law "on the stretcher, indicating that [first responders] weren't moving good enough or fast enough for him." DE 62 at 9:6–10. Notably, EMT Cosenza testified that he did not report that Defendant pushed the stretcher into Paramedic Levine when police asked what had occurred during the reported incident shortly after it occurred. *Id.* at 22:16–23:24, 28:25–29:12.

While the testimony of Paramedic Levine and EMT Cosenza suggests the stretcher may have struck Paramedic Levine against her will, it does not show that Defendant *intentionally* struck Paramedic Levine as required under Section 784.07(1)(a). Further, EMT Cosenza's failure to report any push to the police shortly after the incident detracts from the credibility of the statements Paramedic Levine and EMT Cosenza made at the recent supervised release hearings before me, occurring around a year after the incident.

What's more, the hearing testimony paints a picture of a chaotic scene in which a group of people—inclusive of emergency personnel and family members—endeavored to physically lift a nonresponsive woman onto a stretcher. *See, e.g.*, DE 62 at 7:18–23 (EMT Cosenza describing an "agitated" group of people waiting at the scene), 96:8–17 (Ms. Wisdom: "It was like a lot of—all of us, like, yelling, like, 'Hurry up, Hurry up.' We w[ere] all panicking because they w[ere]n't doing their job fast enough . . . . At the time, it was chaotic because, like I said . . . by the time Highlands County came, everybody was . . . frantic . . . ."); DE 44 at 9:5–10 (Paramedic Levine

describing "trying to figure out where [she was] going" and hearing people around her but being unable to "tell who was talking . . . because [she was] just kind of keeping [her] surroundings in check . . ."). Under such circumstances, unintentional contact between people and the stretcher could be expected. Ms. Wisdom testified that Defendant's only contact with the EMT personnel occurred when Defendant was "putting [the patient] on the stretcher . . . ." DE 62 at 96:21–22. Even EMT Cosenza's testimony regarding a push of the stretcher "to get [Paramedic Levine] out of the way" and place the patient on the stretcher suggests Defendant may have accidentally hit Paramedic Levine with the stretcher during an attempt to reposition it and place Defendant's mother-in-law on it. *Id.* at 9:6–10.

Paramedic Levine's testimony that the stretcher was heavy and could only be moved through force does not sustain the Government's burden to show intent. Even if Defendant intended to move the stretcher, such a conclusion would not necessarily equal a finding of intent to strike Paramedic Levine as a result. Similarly, Paramedic Levine's testimony that Defendant yelled at her to hurry up before pushing the stretcher is insufficient to show intent and is instead consistent with the contention that Defendant pushed the stretcher in a rush to help place his mother-in-law on it.

The Government acknowledges the necessary legal element of intent in its supplemental brief but then focuses on whether Defendant touched or struck Paramedic Levine.  DE 60 at 7–8. Absent proof of intent, however, the Government has not established by a preponderance of the evidence that Defendant violated his supervised release by committing battery against an emergency medical care provider. Therefore, based on the testimony and evidence presented, I do not find that the Government has proven Violation 1.

## 2. Violation 2

In Violation 2, the Government asserts that Defendant resisted arrest when Deputy Long attempted to detain him prior to an arrest. Specifically, the Government contends that Defendant resisted by "attempting to pull away from Deputy Long" when Deputy Long was trying to grab Defendant's hands. DE 60 at 9. Defendant denies this contention, arguing that he complied with Deputy Long's instruction to get out of his vehicle, voluntarily placed his hands behind his back before Officer Long even asked him to do so, and did not disobey any command, attempt to flee, or conceal his identity in any way. DE 61 at 6–8. According to Defendant, he turned toward Deputy Long to inquire why he was arresting or detaining Defendant, which does not constitute resistance against an officer.

> Under Florida Statutes § 843.02:
>
> Whoever shall resist, obstruct, or oppose any officer as defined in s. 943.10(1), (2), (3), (6), (7), (8), or (9) . . . or other person legally authorized to execute process in the execution of legal process or in the lawful execution of any legal duty, without offering or doing violence to the person of the officer, shall be guilty of a misdemeanor of the first degree . . . .

*Id*. The term officer includes a "law enforcement officer," defined as:

> any person who is . . . employed full time by any municipality or the state or any political subdivision thereof; who is vested with authority to bear arms and make arrests; and whose primary responsibility is the prevention and detection of crime or the enforcement of the penal, criminal, traffic, or highway laws of the state.

Fla. Stat. § 943.10(1).

The offense charged in Violation 2 has two elements. *N.H. v. State*, 890 So. 2d 514, 516 (Fla. 3d DCA 2005) (citation omitted). "First, the officer must be engaged in the lawful execution of a legal duty." *Id.* (citation omitted). "Second, the defendant's action, be it by words, conduct or a combination thereof, must constitute obstruction or resistance of that lawful duty." *Id.* at 516–17

(citation omitted). "Section 843.02 does not require that the attempted obstruction succeed. Nor does it limit the offense to resisting arrest," so the statute would also cover obstruction or resistance during detention. *Simeon v. State*, 778 So. 2d 455, 456 (Fla. 4th DCA 2001).

It is undisputed that Deputy Long is a law enforcement officer and was "in the execution of a[ ] legal duty" at the relevant times. Fla. Stat. § 843.02. Thus, the only question is whether Defendant's action constituted obstruction of or resistance against the officer's legal duty. *Id.*

The Government entered as an exhibit Deputy Long's body camera footage of the incident. Gov't Ex. 1. The footage shows that as Deputy Long approached Defendant's car, Defendant stepped out of the vehicle on the passenger's side, took a few steps toward Deputy Long, and, within seconds, raised his arms away from his body. Then, as Deputy Long grabbed Defendant's hands, Defendant stiffened, asking, "Turn around for what?" Defendant turned slightly toward Deputy Long for a moment or two, repeating his first question and adding, "What the hell's going on?" Defendant ultimately turned back around to face away from Deputy Long, who placed handcuffs on Defendant's wrists. During this series of events, Defendant's wife also walked around the car to speak with Deputy Long. Throughout these interactions, which occur from the beginning of the body camera footage through around the 1:37 mark, Defendant and his wife repeatedly asked Deputy Long why Defendant was being arrested or detained. Deputy Long at first said he would answer these questions after he had handcuffed Defendant. After Defendant was handcuffed, Deputy Long stated that Defendant "fit [a] description" provided to Deputy Long.

Florida law provides that a "peace officer making an arrest without a warrant shall inform the person to be arrested of the officer's authority and the cause of arrest except when the person flees or forcibly resists before the officer has an opportunity to inform the person or when giving the information will imperil the arrest." Fla. Stat. § 901.17. "Although noncompliance does not

render the arrest illegal, it is a fact that [a factfinder] should . . . be[ ] allowed to consider in evaluating whether [Defendant]'s actions were reasonable. *Albury v. State*, 910 So. 2d 930, 933 (2d DCA 2005) (citation omitted). Here, upon review of the video footage and other evidence, I find that when Defendant turned to inquire as to the reason for his detention, "his action was not obstruction of or resistance to the officer[ ] but rather was a legitimate and lawful action under the circumstances." *Id.* at 934.  Defendant was attempting to obtain information about why he was being detained and did not obstruct or resist his detention, particularly considering that Deputy Long kept a firm hold of Defendant throughout the interaction. The Government thus has not met their burden to prove Defendant obstructed or resisted. Based on the testimony and evidence presented, I do not find that the Government has proven Violation 2.

### 3.  Violation 3

In Violation Number 3, the Government contends that Defendant—a felon—possessed a firearm when EMS personnel arrived at his mother-in-law's house. Defendant adamantly denies this alleged violation.

Florida Statute § 790.23 states that "[i]t is unlawful for any person to own or to have in his or her care, custody, possession, or control any firearm, ammunition, or electric weapon or device, or to carry a concealed weapon . . . if that person has been . . . [c]onvicted of a felony in the courts of this state . . . ." Fla. Stat. § 790.23(1).[2]

Both Paramedic Levine and EMT Cosenza claim that they saw what appeared to be a firearm in Defendant's waistband when they encountered him on June 25.  Paramedic Levine testified that after pushing the stretcher, Defendant continued to "yell[ ] profanities at" Paramedic Levine,

---

[2] As alleged, Violation 3 also invokes Florida Statutes § 775.087, which reclassifies felonies where, "during the commission of such felony[,] the defendant carries, displays, uses, threatens to use, or attempts to use any weapon or firearm . . . ." Fla. Stat. § 775.087(1).

accused her of failing to do anything, and said, "[Y]ou're gonna get yours." DE 44 at 10:18–11:16.

Paramedic Levine testified that Defendant then "brandished what appeared to be . . . a handgun in

his waistband." DE 44 at 11:16–19; *see also id.* at 12:8–10 ("He did not pull it out, but he did just

lift his shirt up to let me know it's there and said: You're gonna get what's coming to you.").

Paramedic Levine described seeing "[th]e butt of what appeared to be a handgun, not a revolver,

that was black in color on the left[ ]side of his waistband." *Id.* at 11:22–24. Paramedic Levine could

only describe that what she saw was black and had "grip-style stuff." *Id.* at 25:11–15. When asked

if she recognized the brand, she responded, "No, ma'am. Like I said, it was the butt of the gun. So

I could not confirm nor deny the actual gun because it was short[-]lived and not an appropriate

amount of time to gauge that." *Id.* at 25:3–7. Paramedic Levine could not determine whether what

she saw was, in fact, an air soft pistol, a BB gun, or a paintball gun. *Id.* at 25:22–26:2.[3] Further,

Paramedic Levine acknowledged that the black object she saw was in the waistband of black shorts.

*Id.* at 26:14–15.

In contrast to Paramedic Levine's testimony, EMT Cosenza testified that Defendant

*inadvertently* revealed he had a concealed firearm. DE 62 at 10:19–21 ("So once he went to place

her on the stretcher, his shirt lifted up and that's when I happened to notice something in his

[waistband] that would resemble a concealed firearm."). EMT Cosenza agreed that when he saw

what he believed to be a firearm, he was "primarily focusing on the patient . . . ." *Id.* at 25:19–23.

Therefore, EMT Cosenza only saw what he believed to be a firearm "out of the corner of [his] eye."

*Id.* at 26:17–20. EMT Cosenza could not describe what he saw other than that it was "something

that looked like an L-shaped black handle," which made him believe it was a "Glock pistol." *Id.* at

---

[3] Defendant argues that such devices and firearm replicas "do not qualify" for violation of § 790.23. DE 61 at 3. I need
not reach that issue due to the overall lack of specific testimony or corroborating evidence as to the details of what
item Paramedic Levine and EMT Cosenza saw.

27:8–16. Like Paramedic Levine, EMT Cosenza could not rule out that what he saw was a BB gun, replica, air soft pistol, or other "non-firearm." *Id.* at 27:22–28:18.

Paramedic Levine and EMT Cosenza's testimony falls short of satisfying the Government's burden to show Defendant possessed a firearm for several reasons.

*First*, both said they only saw what appeared to be the handle of a gun in Defendant's waistband. While Paramedic Levine testified that she saw "grip-style stuff," EMT Cosenza could only identify "something that looked like an L-shaped black handle." DE 44 at 25:11–15; DE 62 at 27:8–13. No weapons matching this description—indeed, no weapons at all—were found on Defendant when he was arrested later that same night in the hospital parking lot. DE 62 at 44:18–45:14. The vague descriptions provided by Paramedic Levine and EMT Cosenza are too general to establish by a preponderance of the evidence that Defendant possessed a firearm. *Compare U.S. v. Zalvidar*, 327 F. App'x 833, 834 (11th Cir. 2009) (testimony of police officer "that: (1) he saw the handle of a gun in Zalvidar's hand; (2) after seeing the police officer, Zalvidar went back into his apartment, knelt next to a pile of clothes, and proceeded to make strange motions with his body while being located next to the pile of clothes; and (3) police officers then discovered a gun inside of that pile of clothes . . . was sufficient to convict Zalvidar" for being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1)).

Notably, there is a dispute as to whether and how Paramedic Levine and EMT Cosenza reported Defendant's potential possession of a firearm to police immediately after the incident. Paramedic Levine testified that she did not include it in her recorded statement, because police told her that "they needed to know about the push incident only because they were not going to charge [Defendant] for anything else." DE 44 at 35:15–20. EMT Cosenza originally testified that he mentioned seeing a firearm in his statement, but upon reading his statement, he confirmed that no

11

mention of a firearm appeared. DE 62 at 24:19–25:9. Deputy Long initially said he did not recall whether EMT Cosenza reported seeing a weapon, DE 62 at 49:24–50:2, but that information would have been important in preparing to encounter Defendant. *Id.* at 50:3–10.

The first several minutes of the bodycam footage do not depict Deputy Long showing any concern that Defendant was armed. Gov't Ex. 1. Deputy Long did not ask Defendant whether he had or owned a gun until nearly seven minutes into the encounter. Before reaching this inquiry, Deputy Long approached Defendant, placed him in handcuffs, spoke with Defendant and his wife, walked a visibly angry Defendant through the hospital parking lot to a police car (stopping to speak with other officers), read Defendant his *Miranda* rights, and questioned Defendant about pushing EMS personnel. When Deputy Long asked Defendant about possession of a firearm before placing him in the police car, Defendant said he did not have a gun. Deputy Long replied that he was "asking because somebody said they saw one while" Defendant was at the scene of the emergency. Around the same time, Deputy Long began to pat Defendant down and found no weapons. Deputy Long then placed Defendant into a police car. Gov't Ex. 1 at 0:15–7:43.

This conflicting evidence regarding what was reported to police does not change the ultimate fact that no firearm was recovered. Without such corroborating evidence, Paramedic Levine and EMT Cosenza's vague descriptions of a black object seen on Defendant's person are not enough to sustain the Government's burden.

*Second*, witnesses testified that Defendant got into a car immediately upon his mother-in-law being placed in the ambulance and closely followed the ambulance to a hospital, whether as a driver or passenger. DE 62 at 13:16–20 (EMT Cosenza: "And on the way there is when I noticed a car following very closely behind us . . . And when I say very closely, I mean, if I would have tapped the brakes on the ambulance, this car definitely would have hit the bumper of the

truck . . . . [The driver was] [t]he same individual we were dealing with on scene."); *id.* at 96:23–97:1 (Ms. Wisdom: "And once they got my mom in the back of the EMT, the ambulance. We got in my vehicle, and we waited and when they pulled off I followed them. And I was the one driving . . . ."). Given the chaos of the incident and Defendant's apparent rush to immediately follow the ambulance to the hospital out of concern for his family member's well-being, I do not find credible the suggestion that Defendant had time to dispose of a firearm before arriving at the hospital, where he was searched and found to be without weapons.

*Third*, Defendant's family members testified that they never saw a gun on Defendant's person that day. DE 62 at 76:9–14, 85:16–18, 91:20–25. This testimony coincides with the fact that no weapon was found on Defendant's person incident to his arrest in the hospital parking lot.

*Fourth*, Defendant does not have a history of carrying firearms. Defendant's wife testified that Defendant has never been charged with a crime related to guns or other weapons. DE 62 at 92:1–4. Defendant's Presentence Investigation Report confirms that though Defendant has had multiple encounters with law enforcement, searches of his home, vehicle, and person did not yield any firearms. There is therefore no indication that Defendant has a practice of arming himself.

For all these reasons, I conclude that the Government has not proven Violation 3—that Defendant violated Florida law by possessing a weapon.

## CONCLUSION

The Government has not met its burden to show by a preponderance of the evidence that Defendant committed Violations 1, 2, or 3.

**ACCORDINGLY**, based on the foregoing, I respectfully recommend that Violations 1, 2, and 3 be dismissed, because the Government has not sustained its burden of proof regarding these alleged violations.

The parties shall have fourteen (14) days from the date of this Report and Recommendation within which to file objections, if any, with the Honorable Robin L. Rosenberg, the United States District Judge assigned to this case. Pursuant to Federal Rules of Criminal Procedure, Rule 59(b)(2), failure to file objections timely waives a party's right to review and bars the parties from attacking on appeal any legal rulings and factual findings contained herein.  **Conversely, if a party does not intend to object to this Report and Recommendation, then that party shall file a Notice of such within five (5) days of the date of this Report and Recommendation.**

**DONE AND RECOMMENDED** in Chambers at Fort Pierce, Florida, this 28th day of July, 2025.

SHANIEK MILLS MAYNARD
U.S. MAGISTRATE JUDGE